# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **JANET E. CARTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:12cv1708 RWS** |
| | ) | **TCM** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Janet E. Carter for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b.

Ms. Carter has filed an opening brief and a reply brief in support of her complaint; the Commissioner has filed a brief in support of her answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Janet Carter (Plaintiff) applied for DIB and SSI in September 2009, alleging she had become disabled on August 7, 2008, by arthritis, depression, a cyst on her right wrist, and

problems with her hands, left arm and shoulder, and neck.  (R.[1] at 153-57, 181.)  Her applications were denied initially and following an April 2011 hearing before Administrative Law Judge (ALJ) Thomas C. Muldoon.  (Id. at 7-20, 26-50, 68-69, 74-77 96-99.)  After reviewing additional evidence, the Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-5.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff, fifty-four years old at the time of the hearing, testified that she was then homeless after living in a succession of three shelters.  (Id. at 29-30.)  She sleeps at either her daughter's house or an emergency shelter.  (Id. at 30-31.)  Plaintiff is 5 feet 4 inches tall and weighs approximately 130 pounds.  (Id. at 31.)  She has three children, all adults, and four grandchildren.  (Id.)  She is single, and always has been.  (Id. at 32.)  She has a driver's license.  (Id.)  She completed the eleventh grade; she was in regular classes.  (Id. at 32-33.)  She tried to get a General Equivalency Degree (GED), but did not complete the course.  (Id. at 33.)  She is right-handed.  (Id. at 42.)

Currently, she is in an anger management, education, and recovery program.  (Id. at 33.)  The recovery is from drugs.  (Id.)  Five days a week, she attends the programs from 9

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

o'clock in the morning to 2 o'clock in the afternoon.  (Id. at 48.)  She has been in the program for three months.  (Id.)  Before this program, she attended various others.  (Id.)

The last job Plaintiff had was doing custodial work.  (Id. at 34, 35.)  She worked at this job for four to five months.  (Id. at 35.)  The only work Plaintiff has ever done is cleaning.  (Id. at 36.)  Plaintiff explained that she is unable now to work because of the pain in her arms and hands and her depression.  (Id. at 37.)  She is seeing a therapist and a psychiatrist.  (Id.)  Her current prescribed medications include Lexapro,[2] Seroquel,[3] Celebrex[4], gemfibrozil,[5] Flexeril,[6] and Flonase.[7]  (Id. at 38.)  She also uses over-the-counter ibuprofen.  (Id.)  Sometimes, her medications make her throat close up and her thoughts not to "be right," e.g., she thinks of hurting herself.  (Id. at 38-39.)  She cannot concentrate for a solid hour.  (Id. at 39.)

Also, she has pain in her left arm and hip.  (Id. at 39-40.)  The pain is not getting better.  (Id. at 40.)  Her ability to use her right hand is sporadic.  (Id. at 42.)  For instance, sometimes she can use a pen or pencil and sometimes she has to wait for medication to take

---

[2]Lexapro is prescribed for the treatment of major depressive disorder and for generalized anxiety disorder.  Physicians' Desk Reference, 1130 (65th ed. 2011) (PDR).

[3]Seroquel is an antidepressant.  See Id. at 735.

[4]Celebrex is a nonsteroidal anti-inflammatory medication used to treat arthritis.  Id. at 201.

[5]Gemfibrozil is the generic form of Lopid and is prescribed to treat high blood cholesterol. See Lopid, http://www.drugs.com/search.php?searchterm=lopid (last visited July 30, 2013).

[6]Flexeril (cyclobenzaprine) is a muscle relaxant.  Flexeril, http://www.drugs.com/search.php?searchterm=flexeril (last visited July 30, 2013).

[7]Flonase is a nasal spray prescribed for the treatment of rhinitis.  PDR at 1361, 1362.

effect.  (Id. at 43.)  Her doctor has told her she cannot lift over five pounds.  (Id.)  Her doctor,

Dr. Asaro,[8] has restricted the chores she can do at the shelters.  (Id. at 43-44.)  The pain

begins in her fingers and goes up to her shoulder.  (Id. at 44.)  She left the most recent shelter

because she could not do the chores they assigned her to do.  (Id.)

Plaintiff used to love to skate, but no longer can.  (Id. at 46.)  She does not have any

close friends.  (Id.)

Plaintiff used to be addicted to crack cocaine, but has not used it since January 2008.

(Id. at 46-47.)  She stopped using marijuana, which she had occasionally smoked, at the same

time.  (Id. at 47.)  She last drank alcohol the past Christmas.  (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the

application process, documents generated pursuant to Plaintiff's applications, records from

health care providers, and various assessments of her physical or mental capabilities.

When applying for DIB and SSI, Plaintiff completed a Disability Report.  (Id. at 180-

89.)  She was then 5 feet 1 inch tall and weighed 142 pounds.  (Id. at 180.)  Her impairments,

see pages one to two, supra, limit her ability to work by preventing her from using her hands

and turning her neck.  (Id. at 181.)  Also, her medications constantly make her drowsy.  (Id.)

Her impairments first bothered her on August 7, 2008, and prevented her from working the

same day.  (Id.)  She stopped working, however, on May 11, 2008.  (Id.)  The job was full-

time and she could no longer work full-time due to her impairments.  (Id.)  The job Plaintiff

_____

[8]The transcript refers to a Dr. "Estarrow"; the Court will employ the correct spelling, "Asaro."

had performed the longest was cleaning Bi-State buses. (Id. at 182.) This job required, among other duties, that she reach for eight hours each day and write, type, or handle small objects for seven hours. (Id. at 183.) It also required that she climb, stoop, kneel, and crouch for seven hours and crawl for four and one-half hours. (Id. at 182.) She did not have to handle, grab, or grasp big objects. (Id.) She completed the twelfth grade. (Id. at 186.) She had not been in special education classes. (Id.)

The interviewer who spoke with Plaintiff when she was applying for DIB and SSI noted that she had difficulty writing, wore a splint on her right wrist, and could bend the fingers on her left hand. (Id. at 178.)

One of Plaintiff's daughters completed a Function Report on her behalf. (Id. at 190-97.) She reported that Plaintiff does not sleep at night. (Id. at 190.) Because of her impairments, she can not lift things, use her hands, think, and mingle. (Id. at 191.) Because of her pain, she tosses and turns all night. (Id.) It takes her longer to get dressed than it formerly did. (Id.) She usually uses both hands to feed herself. (Id.) The daughter does Plaintiff's hair. (Id.) The only meals Plaintiff prepares are ones that can be microwaved. (Id. at 192.) Because of the problems with her hands and the medications, she does not do any house or yard work. (Id. at 193.) Plaintiff's only hobby is watching television. (Id. at 194.) The only place she goes is to church. (Id.) Plaintiff sometimes has difficulties getting along with people because of mood changes, e..g, she goes from happy to angry. (Id. at 195.) Her impairments adversely affect her abilities to lift, squat, bend, stand, reach, walk, kneel, talk, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use

her hands, and get along with others.  (Id.)  They do not affect her abilities to hear and sit.  (Id.)  She has to use both hands to hold things.  (Id.)  She cannot walk farther than three blocks.  (Id.)  She does not follow instructions well.  (Id.)  She takes medication to help with stress.  (Id. at 196.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her applications.  (Id. at 209-15.)  As of approximately October 2009, the range of motion in her hands and fingers is less.  (Id. at 210.)  She does not have any new illnesses, injuries, or conditions.  (Id.)

In the thirty-six years between 1973 and 2008, inclusive, Plaintiff had no earnings in eight years.  (Id. at 168.)  Her highest annual earnings were $10,679,[9] in 2003.  (Id.)  In only two other years, 1979 and 2002, did her earnings exceed $5000.  (Id.)  In fourteen years, not including the eight years in which she had no earnings, Plaintiff earned less than $1,000.  (Id.)  She had annual earnings of $105 in 2006, none in 2007, and $489 in 2008.  (Id.)

The relevant medical records before the ALJ are summarized below in chronological order.

In November 2007, Plaintiff consulted a health care provider at Grace Hill Neighborhood Health Centers (Grace Hill) to request a sleeping pill.  (Id. at 234-37, 256-61, 394-97, 416-17.)  She was up all night, and tired all day.  (Id.)  Also, she was having difficulty keeping food and drink down.  (Id. at 234.)  She was diagnosed with gastroesophageal reflux disease (GERD) and told to stop smoking.  (Id. at 237.)

---

[9] All amounts are rounded to the nearest dollar.

Nine days later, Plaintiff went to St. Louis Connect Care (SLCC) about a cough and sore throat she had had for the past two days. (Id. at 268, 331-37, 393.) Chest x-rays showed possible interstitial lung disease. (Id. at 268, 332.) Plaintiff was given prescriptions for Robitussin and Septra. (Id. at 331.)

Plaintiff returned to SLCC on May 11, 2008, reporting that she had been scheduled for surgery on a possible ganglion cyst on her right wrist and had decided not to proceed. (Id. at 323, 325-29.) She further reported that she drank alcohol and smoked cigarettes, but she did not do drugs. (Id. at 325.) She was given a splint for her wrist and a prescription for Motrin, told she needed to be off work that day, and was to return in one to three days. (Id. at 326-27.) She indicated on a form that the wrist problem was a work-related injury. (Id. at 325.)

Seven days later, Plaintiff reported to a health care provider at Grace Hill that she had been let go the past Sunday from her job. (Id. at 231, 391, 423-24.)

Plaintiff returned to Grace Hill in July for a blood pressure check and for wrist pain. (Id. at 230, 252-53, 390, 424-26.) She was prescribed Celebrex for the pain. (Id. at 230.)

In September, she informed the health care providers at Grace Hill that she had joint pain throughout her body. (Id. at 224-27, 239-46, 384-87, 429.) She reported that Celebrex had helped her pain, but had also upset her stomach. (Id. at 224.) She had insomnia and fatigue, and a lump on her right wrist made it difficult for her to move the wrist. (Id.) Her left elbow was swollen. (Id. at 226.) She was referred to a dermatologist (for examination

of facial moles) and to a surgeon (for removal of a cyst), and was prescribed Tramadol[10] and Flexeril.  (<u>Id.</u> at 227.)  She was to return in one month.  (<u>Id.</u>)

Chest x-rays taken later in the month were normal.  (<u>Id.</u> at 266, 322.)

Plaintiff returned to SLCC on January 7, 2009, for treatment of a cyst on her right hand and swelling in her left hand.  (<u>Id.</u> at 318-20.)  Her symptoms were becoming worse.  (<u>Id.</u> at 318.)  She had a limited range of motion in her right wrist.  (<u>Id.</u>)  X-rays of her left hand revealed minimal osteoporosis.  (<u>Id.</u> at 320.)

On January 23, she complained to the health care providers at Grace Hill about pain in her shoulders and wrists.  (<u>Id.</u> at 220-23, 238, 380-83.)  She reportedly smoked one pack of cigarettes every three days and drank beer once a month.  (<u>Id.</u> at 221.)  Her gait was steady, but she had a limited range of motion in her upper extremities.  (<u>Id.</u> at 222.)  She was alert and oriented to time, place, and person.  (<u>Id.</u>)  She was advised to stop taking Naproxen and take only Celebrex, in addition to trazodone.[11]  (<u>Id.</u> at 223.)  She was to return in four months.  (<u>Id.</u>)

Three days later, Plaintiff was seen at SLCC for a follow-up visit for the pain in two fingers on her left hand, both wrists, and both thumbs.  (<u>Id.</u> at 263, 315, 317, 399-400.)  Plaintiff was to have a steroid injection, was prescribed Celebrex, and was to wear braces on her wrists.  (<u>Id.</u> at 263, 315.)

---

[10]Tramadol is prescribed for the relief of moderate to severe chronic pain.  <u>PDR</u> at 2888.

[11]Trazodone is prescribed for the treatment of major depressive disorder.  <u>Id.</u> at 3446.

On February 23, Plaintiff reported to the health care providers at Grace Hill that she was depressed and stressed about not working. (Id. at 379.) She did not have any suicidal thoughts. (Id.) She was diagnosed with depression and prescribed Lexapro. (Id.)

Two days later, Plaintiff was seen at SLCC for a follow-up visit about her pain. (Id. at 262, 314, 398.)

When seen at SLCC on March 25, Plaintiff was referred to a hand surgeon. (Id. at 278, 312-13.)

In August, Plaintiff was seen at SLCC Urgent Care for complaints of pain in her left neck and shoulder radiating down to her left hand and fingers for the past week and of right wrist and thumb pain. (Id. at 272, 290-96.) Her medications included Lexapro, Tramadol, and Prevacid. (Id. at 291.) She smoked one-half pack of cigarettes a day, but did not use drugs or drink alcohol. (Id.) Her hand grip was 4/5. (Id. at 292.) She was anxious and grimaced in pain. (Id.) She was given a shot of toradol[12] in her right buttock. (Id.) She was discharged with prescriptions for nortriptyline, an antidepressant,[13] and Flexeril. (Id. at 293.) A separate prescription was written for splints for each hand, to be worn continuously (Id. at 272.)

Plaintiff was seen on September 2 at Grace Hill for pain in her neck, left shoulder, and wrists. (Id. at 341-43.) Plaintiff described the pain as achy and dull. (Id. at 341.) It was

---

[12]Toradol is a nonsteroidal anti-inflammatory drug. See Toradol, http://www.drugs.com/search.php?searchterm=toradol (last visited July 30, 2013).

[13]See Nortriptyline, http://www.drugs.com/nortriptyline.html (last visited July 30, 2013).

aggravated by activity and relieved by medication. (Id.) She was given refills of her medications. (Id. at 343.)

Three weeks later, Plaintiff was seen by David Kieffer, M.D., at SLCC about the pain in both her wrists. (Id. at 286-89.) X-rays of her right wrist and left hand revealed mild osteoporosis in each. (Id. at 287-88.) There were no "significant arthritic changes" in either. (Id.) X-rays of her cervical spine were unremarkable. (Id. at 289.)

On September 27, Plaintiff went to SLCC Urgent Care about pain in her right hand and left shoulder for the past four years. (Id. at 279-85.) She requested a toradol shot, but was advised she could not have another one after having one three weeks earlier. (Id. at 280.) She had been getting steroid injections and had been advised by her primary care physician that she could not have another one. (Id.) Her medications included Celebrex, Lexapro, Prevacid, nortriptyline, Tramadol, and cyclobenzaprine. (Id.) Her past medical history included diagnoses of depression, GERD, degenerative joint disease, arthritis, and a cyst. (Id.) She smoked cigarettes, but did not use drugs or drink alcohol. (Id.) She complained of neck pain, but had stiffness or swelling in the neck. (Id. at 281.) She had a limited range of motion in her neck. (Id.) She was oriented to time, place, and person. (Id.) She was told to apply moist heat, use a topical ointment, and ask her primary care physician about physical therapy and "other alternatives for pain." (Id.) No prescriptions were given. (Id.)

Plaintiff returned to Grace Hill on October 2 about pain in her neck and right wrist. (Id. at 338-40, 402-04.) The physical examination was routine. (Id. at 339.)

When seen by Dr. Kieffer on October 14, Plaintiff rated her hand pain as a nine on a ten-point scale.  (Id. at 365-66, 370.)  Her wrists showed abnormalities and were tender on palpation.  (Id. at 365.)  She had swelling and stiffness in one or more joints.  (Id.)  Dr. Kieffer concluded that the cortisone shots had failed to give her relief and concluded she should consult a specialist, Dr. Debartolo.  (Id. at 365, 370.)

Consequently, Plaintiff was examined by Thomas F. Debartolo, M.D., in November.  (Id. at 355-62.)  She had a "mildly positive Tinel's carpal tunnel"[14] on the right hand.  (Id. at 355.)  The grip strength in her right hand was half that in her left hand.  (Id.)  She had a positive Finkelstein's test on the right.[15]  (Id.)  She also had a limited range of motion in her right hand, which Dr. Debartolo stated "should be correlated with cooperation versus a true organic dysfunction."  (Id.)  X-rays of her hands showed no acute osseous injury.  (Id. at 361-62.)  He gave Plaintiff a corticosteroid and local anesthetic injection to the region of the first dorsal extensor compartment.  (Id. at 356.)

Beginning on December 15, Plaintiff started attending individual therapy sessions at Grace Hill.  (Id. at 435.)  Her therapist was Nancy Phillips-Kuelker, M.S.W, L.C.S.W (licensed clinical social worker).  (Id.)  A treatment plan generated by Ms. Phillips-Kuelker after ten sessions, on March 18, 2010, listed six problems:  (1) depression; (2) "[s]erious

---

[14]See note 16, infra.

[15]The Finkelstein test is used to confirm whether a patient has de Quervain's tenosynovitis.  De Quervain's tenosynovitis, http://www.mayoclinic.com/health/medical/IM00780 (last visited July 30, 2013).  The test is positive when pain is caused when the patient bends her thumb down across the palm of the hand, covers the thumb with her fingers, and then bends her wrist toward her little finger.  Id.

medical issues impacting psychological functioning – chronic pain"; (3) medication side effects; (4) social skills; (5) sustained abstinence from all mood-altering substances; and (6) assault behavior. (Id. at 427.) The goal for the first problem was for Plaintiff's depressive symptoms not to impair her daily functioning. (Id.) For the third problem, Plaintiff was to speak with her doctor about grogginess and skipping medications. (Id.)

Plaintiff was seen on January 15, 2010, at Grace Hill for hyperlipidemia and depression. (Id. at 375-78, 407.) The first episode of depression reportedly occurred in 2006. (Id. at 375.) Plaintiff was fatigued and had no energy. (Id.) She had a depressed mood, diminished interest or pleasure, feelings of guilt or worthlessness, and hallucinations. (Id.) She was taking her medications regularly. (Id.) Her prescriptions were renewed. (Id. at 377-78.)

Five days later, Plaintiff returned to Dr. Kieffer for treatment of her hand pain, which she rated as an eight. (Id. at 363-64, 369, 371.) He noted that the appearance of her hands was abnormal. (Id. at 363.) They were tender on palpation and weak. (Id.) Movement of her hands caused pain. (Id.) Tinel's and Phalen's signs were both present.[16] (Id.) Dr. Kieffer's assessment was of carpal tunnel syndrome. (Id.) Plaintiff was to be referred to a hand specialist. (Id. at 363, 369.)

---

[16]Tinel's and Phalen's tests are used in the diagnosis of carpal tunnel syndrome. See Jonathan Cluett, M.D., Carpal Tunnel Syndrome http://orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel (last visited July 30, 2013). A Tinel's sign is present when tingling in the fingers is made worse by tapping the median nerve along its course in the wrist. Id. A Phalen's sign is present when pushing the back of the hands together causes the complained-of symptoms. Id.

Plaintiff was seen at Grace Hill on February 26 for complaints of insomnia and requests for refill of Ambien.  (Id. at 372-74.)  A refill was given.  (Id. at 373.)  On March 11, she was referred by a Grace Hill provider to a dermatologist.  (Id. at 367-68, 461-62.)  Her chronic conditions included episodic mood disorder, elevated blood pressure, pain in the joint involving the upper arm, and generalized osteoarthrosis.  (Id. at 367.)

Plaintiff told Dr. Kieffer in April that the pain in her hands was an eight.  (Id. at 458-59, 515-17.)  His examination findings were as before.  (Id. at 458.)  As before, Plaintiff was diagnosed with carpal tunnel syndrome and was to consult with a specialist at Barnes Jewish Hospital (Barnes).  (Id. at 458, 515.)

In July, Plaintiff did consult a surgeon at Barnes, Amy Marcelle Moore, M.D., for an evaluation for carpal tunnel syndrome, reporting that the pain in her right wrist was unrelieved by injections.  (Id. at 473-86.)  It was noted that Plaintiff did not have difficulties with personal hygiene tasks or with "activities of daily living including cooking, cleaning, shopping and driving."  (Id. at 480.)  She did have memory problems.  (Id.)  X-rays of her right hand and wrist revealed  mild spurring along the metacarpal phalangeal joint of the right hand, a healed fracture of the fifth metacarpal, and mild narrowing of the interphalangeal joint of the small finger.  (Id. at 485.)  X-rays of her left hand revealed mild narrowing of the distal interphalangeal joint of her small finger.  (Id.)  On examination, she was in no apparent distress.  (Id. at 478.)  Her right hand was neurovascularly intact with full sensation and an intact radial nerve.  (Id.)  She had a full range of motion in her fingers, thumb, and wrist.  (Id.)  She also had "a bony prominence over the radial styloid with some mild inflammation,

edema, and the first extensor compartment." (Id.) Her Finkelstein's test was not positive and did not elicit the type of pain Plaintiff described. (Id.) She was tender to palpation over the styloid. (Id.) "Otherwise, her wrist examination [was] not impressive." (Id.) Her left hand also appeared intact. (Id.) Dr. Moore was unable to elicit a triggering of Plaintiff's small, ring, and long fingers, although Plaintiff had reported such. (Id.) Plaintiff had "slowing with her range of motion" and stiff joints, leading Dr. Moore to question whether the problem was more "arthritis base[d]" than a trigger issue. (Id.) She had a good range of motion in the thumb of her left hand and a normal left wrist. (Id.) Plaintiff's right thumb was put in a thumb splint in order to rest the thumb. (Id.) She was to wear the splint at all times to determine if that decreased the flare of tendinitis over her first extensor compartment. (Id.) Also, she was given exercises for the triggering and to improve her range of motion in her right hand. (Id.) She was to return in two weeks, at which time the subject of surgery or more injections would be discussed. (Id.)

Plaintiff returned in six weeks, seeing Andre S. Nimigan, M.D., on September 21. (Id. at 467-72.) The thumb splint had provided some relief from sensitivity and pain, but the relief was not complete. (Id. at 470.) Dr. Nimigan noted that "[i]t [was] very difficult to narrow down the pain that [Plaintiff] [was] experiencing" because she had a negative Finkelstein's test and was not showing any evidence of thumb or digital flexor tendon triggering. (Id.) He advised Plaintiff that there was no surgery or injection that he could offer that he thought would be of any benefit because he could not explain why she was in pain and had been so for at least two or three years. (Id.) He advised her to continue to work

- 14 -

with her psychiatrist to find ways to deal with her pain and to continue to consult with Dr. Kieffer.  (<u>Id.</u> at 471.)

In October, Plaintiff saw Philip Asaro, M.D., with Grace Hill about her hyperlipidemia, depression, wrist pain, and rhinitis.  (<u>Id.</u> at 524-27.)  As to the depression, she was doing well on current medications.  (<u>Id.</u> at 524.)  She had been told by the physicians at Barnes that they had no more to offer and that she should follow-up at SLCC.  (<u>Id.</u>)

In February 2011, as advised by Dr. Nimigan, Plaintiff again consulted Dr. Kieffer.  (<u>Id.</u> at 507-12, 520.)  On examination, she was tender to palpation of both hands, her hand motion was abnormal, and she was weak in both hands.  (<u>Id.</u> at 508.)  His diagnosis was compression arthralgia of both wrists and hands, tendonitis and enthesopathy, and carpal tunnel syndrome.  (<u>Id.</u>)  He thought she might require a median nerve decompression, and referred her to an orthopedist.  (<u>Id.</u> at 510-12.)

In April, Plaintiff was given an injection of toradol in her left buttock for a diagnosis of "strain."  (<u>Id.</u> at 534.)  The record does not specify what was strained.

Six days later, on April 7, Plaintiff was seen by an orthopedist, Maryelizabeth Rashid, M.D., at St. Louis University Hospital.  (<u>Id.</u> at 536-44.)  On a medical history form, Plaintiff marked that the injury was work related and the subject of current litigation.  (<u>Id.</u> at 540.)  Plaintiff described increasing problems using her hands during the past few years and decreased grip strength.  (<u>Id.</u> at 536.)  These problems were most noticeable when she cooked.  (<u>Id.</u>)  She would have trouble transferring pots and pans between stove and sink and transferring utensils between hands.  (<u>Id.</u>)  Anti-inflammatory medications such as Celebrex

helped her the most. (Id.) On examination, she had some tenderness in her right upper extremity over the radial aspect of the distal radial border of the distal forearm. (Id.) She had a full passive range of motion in all her fingers and a full range of motion in her right wrist and elbow. (Id.) The grip strength in her right hand was 4/5. (Id.) She had some mild pain to palpation over the radial border of the distal radius in her left upper extremity. (Id.) She had bilateral negative Tinel's sign and Finkelstein's test. (Id. at 536, 537.) X-rays of both hands showed minimal squaring off of the posterior interphalangeal joints and minimal sclerosis in the carpometacarpal joint in each hand. (Id. at 537, 541-44.) Dr. Rashid's impression was of arthritis and encouraged Plaintiff to continue taking anti-inflammatory medications and use her hands as much as possible. (Id. at 537.) She asked Plaintiff if she wished a referral to a rheumatologist, but Plaintiff declined, explaining that she had "socioeconomic issues that need[ed] to be managed first." (Id.)

Also before the ALJ were various assessments of Plaintiff's impairments and their resulting limitations.

In October 2009, a Physical Residual Functional Capacity Assessment of Plaintiff was completed by Patricia Chaplin, a single decisionmaker.[17] (Id. at 62-67.) The primary diagnosis was mild osteoporosis in her hands; the secondary diagnosis was hypertension; and another alleged impairment was gastroesophageal reflux disease. (Id. at 62.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or

_____

[17]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

carry twenty pounds; frequently lift or carry ten pounds; and stand, sit, or walk for approximately six hours in an eight-hour day. (<u>Id.</u> at 63.) Her ability to push and pull was otherwise unlimited. (<u>Id.</u>) She had no postural, manipulative, visual, communicative, or environmental limitations. (<u>Id.</u> at 64-65.)

The same day, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Terry Dunn, Ph.D. (<u>Id.</u> at 344-54.) Plaintiff was assessed as having an affective disorder, i.e., depression, that was not severe. (<u>Id.</u> at 344, 347.) This disorder resulted in mild restrictions in her daily living activities and caused her mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (<u>Id.</u> at 352.) There were no repeated episodes of decompensation of extended duration. (<u>Id.</u>) Dr. Dunn noted that Plaintiff had only sought mental health treatment from her treating physician and not from any mental health professional. (<u>Id.</u> at 354.)

In March 2010, Plaintiff was evaluated by Vincent Stock, M.A., a licensed psychologist, at the request of her counsel. (<u>Id.</u> at 442-52.) Plaintiff informed him that she had dropped out of school in the twelfth grade. (<u>Id.</u> at 443.) She had received special education services in the third, fourth, and fifth grades for a behavior disorder and fighting. (<u>Id.</u>) Her last job ended after six months when she was laid off after injuring her right hand at work. (<u>Id.</u>) She cannot work at a full-time job now because of her arthritis, limited range of motion in her fingers and right hand, and constant pain. (<u>Id.</u>) Physical problems are the only reason why she cannot currently work. (<u>Id.</u>) Nine hours out of ten, she has pain in her hands. (<u>Id.</u> at 444.) She smokes a pack of cigarettes a day. (<u>Id.</u>) She quit drinking alcohol

in January 2010, quit using cocaine in March 2009, and quit smoking marijuana a year earlier. (Id.) It takes her a long time to go to sleep. (Id.) She wakes up at least three times a night due to anxiety and pain. (Id.) On examination, Plaintiff was cooperative and friendly. (Id. at 445.) She was also agitated, had a circumstantial thought process, had "soft and pressured" speech, and was apparently disoriented. (Id.) She reported that she was depressed seven days out of seven, had auditory hallucinations, had persecutory delusions, and had impaired immediate, recent, and remote memory. (Id.) She could not do simple calculations. (Id. at 446.) Her abstract capability was also impaired. (Id.) For instance, she did not know the meaning of the saying "Strike while the iron is hot." (Id.) Her sleep was "significantly" impaired. (Id.) She did not maintain eye contact with Mr. Stock. (Id. at 445, 446.) Mr. Stock diagnosed Plaintiff with major depressive disorder, recurrent, severe with psychotic features, and a Global Assessment of Functioning of 45.[18] (Id. at 446-47.) He opined that she was markedly limited in her activities of daily living and in social functioning. (Id. at 447.) She was extremely limited in her concentration, persistence, and pace. (Id.)

Additionally, Mr. Stock completed a Medical Source Statement – Consultative Examination form on Plaintiff's behalf. (Id. at 449-52.) In the five listed abilities for the

---

[18]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

category of activities of daily living, he assessed her as being markedly limited in four: her abilities to (1) cope with normal stress; (2) function independently; (3) maintain reliability; and (4) adhere to basic standards of neatness and cleanliness. (Id. at 449.) She was moderately limited in her ability to behave in an emotionally stable manner. (Id.) In the five abilities listed for the category of social functioning, Plaintiff was assessed as being markedly limited in three, i.e., interacting with strangers or the general public; accepting instructions or responding to criticism; and maintaining socially acceptable behavior, and moderately limited in the remaining two, i.e., relating to family, peers, or caregivers and asking simple questions or requesting assistance. (Id. at 450.) She was extremely limited in two of the five abilities for the category of concentration, persistence, or pace: (1) perform at a consistent pace without an unreasonable number and length of breaks and (2) respond to changes in work setting. (Id.) She was markedly limited in the remaining three abilities: (1) making simple and rational decisions; (2) maintaining attention and concentration for extended periods; and (3) sustaining an ordinary routine without special supervision. (Id.)

He further opined that she could "apply commonsense understanding to carry out simple one to two step instructions: for four hours in an eight-hour period. (Id. at 451.) She could not interact appropriately with coworkers, supervisors, and the general public for longer than two hours. (Id.) Her psychologically-based symptoms would cause her to miss work at least three times a month and be late at least three times a month. (Id.) Her disability began in February 2008. (Id. at 452.)

Ms. Phillips-Kuelker wrote in May 2010 that Plaintiff had recently had sessions on March 3, 11, 18, 25, and 31; April 7, 14, 21, and 27; and May 14. (<u>Id.</u> at 454.)

Pursuant to her DIB and SSI applications, Plaintiff was evaluated in November 2010 by Alison Burner, M.A., a licensed psychologist. (<u>Id.</u> at 494-97.) Plaintiff reported that she had completed the eighth grade. (<u>Id.</u> at 494.) When questioned about the inconsistency between that statement and other information that she had attended high school, Plaintiff stated that "she was 'pretty sure' she only completed the 8th grade." (<u>Id.</u>) She had been told by her doctor to stop working because she had "'tearing issues.'" (<u>Id.</u> at 495.) She reported that she had been addicted to crack cocaine and alcohol, but no longer used either. (<u>Id.</u>) She was "somewhat vague" about when she started and ended the use. (<u>Id.</u>) Ms. Burner concluded that Plaintiff had not used either substance in approximately four months or less. (<u>Id.</u>) Plaintiff was wearing a carpal tunnel splint on one hand; Ms. Burner did not specify which hand. (<u>Id.</u>) On examination, Plaintiff was cooperative; had appropriate eye contact and affect; had clear speech; and was oriented to person, place, and time. (<u>Id.</u>) She did not have any psychomotor agitation. (<u>Id.</u>) She denied visual and auditory hallucinations. (<u>Id.</u>) Her thought content was rational, organized, "very concrete," and lacked any evidence of depression, anxiety, paranoia, or other significant disorder. (<u>Id.</u>) Her immediate memory was intact; her recent and remote memory was "adequate." (<u>Id.</u> at 496.) Her mental control was inadequate. (<u>Id.</u>) Her abstract thinking was within low normal limits; her insight and judgment were within the average range. (<u>Id.</u>) For instance, she interpreted the saying "Don't cry over spilled milk" to mean "When it's done it's done." (<u>Id.</u>) Plaintiff stated that she is

unable to care for her daily needs because of the problems with her arm and hand. (Id.) When she was living alone, and not in a shelter as she then was, she was able to shop, clean, do laundry, and other household tasks. (Id.) Her hygiene and grooming were adequate. (Id.) Her intellectual functioning appeared to be below average to average. (Id.) Her concentration and persistence appeared to be adequate. (Id.) "[She] did not report any significant mental health issues." (Id.) When asked about Mr. Stock's reference to her report of auditory hallucinations and constant persecutory delusions, Plaintiff explained that "she sometimes see [sic] some dark spots floating in her eyes and she doesn't feel safe in the shelter and feels that others are plotting to steal her belongings even though they are meager." (Id. at 496-97.) Ms. Burner did not consider these statements sufficient to support a diagnosis of a thought disorder, psychosis, or paranoia. (Id. at 497.) Instead, she diagnosed Plaintiff with alcohol dependence, cannabis dependence, and cocaine dependence, all in early remission. (Id.) She rated Plaintiff's GAF as 65.[19] (Id.)

On a Medical Source Statement of Ability to Do Work-Related Activities (Mental), Ms. Burner rated as moderate Plaintiff's restrictions in (a) understanding and remembering complex instructions; (b) carrying out complex instructions; and (c) her ability to make judgments on complex work-related decisions. (Id. at 500.) If she abstained from drug and alcohol use, she was restricted in these tasks when simple instructions or simple work-related decisions were at issue. (Id.) Her ability to interact appropriately with the supervisors, co-

---

[19]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

workers, and the public was not restricted as long as she refrained from using drugs and alcohol.  (Id. at 501.)

## The ALJ's Decision

The ALJ first determined that Plaintiff had met the insured status requirements of the Act through March 31, 2009, and had not engaged in substantial gainful activity since her alleged onset date of August 7, 2008.[20]  (Id. at 12.)  The ALJ next found that Plaintiff had severe impairments of degenerative joint disease, tenosynovitis, carpal tunnel syndrome, mild osteoporosis of the bilateral upper extremities, major depressive disorder, polysubstance dependence, and a history of a right ganglion cyst.  (Id. at 13.)  After summarizing the medical records before him, including the assessments of Mr. Stock and Ms. Burner, the ALJ concluded that Plaintiff did not have an impairment or combination thereof that met or medically equaled an impairment of listing-levels severity.  (Id. at 13-15.)  She did have the residual functional capacity (RFC) to perform light work[21] except she was also restricted to lifting or carrying no more than twenty pounds occasionally and ten pounds frequently; to

---

[20]August 7, 2008, is the day after another ALJ rendered an adverse decision on Plaintiff's January 2007 DIB and SSI applications.  See Carter v. Astrue, No. 4:10cv0577 AGF, slip op. at 10 (E.D. Mo. September 30, 2011).  That decision, adopted by the Appeals Council, was affirmed on judicial review.  Id.

[21]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . .  [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls. . . .  If someone can do light work, . . . he or she can also do sedentary, unless there are additional limiting factors such as loss of fine dexterity . . . ."  20 C.F.R. §§ 404.1567(b), 416.967(b).

performing no more than simple work activity; and to more than frequently handling, gripping, or fingering with her upper extremities.  (<u>Id.</u> at 16.)

When assessing Plaintiff's RFC, the ALJ considered her testimony, sporadic work history, and daily activities.  (<u>Id.</u> at 16-17.)  He also considered, among other things, the absence of any medical record corresponding to her alleged disability onset date; the lack of objective medical evidence supporting her subjective complaints; her minimal or conservative treatment; the lack of strong prescription pain medication; and the lack of any evidence that her prescribed pain medication is not generally effective or has significant side effects.  (<u>Id.</u>)  He observed that she "did not appear to be in any obvious credible discomfort" during the hearing and did appear to be able to remember information and give appropriate testimony.  (<u>Id.</u> at 18.)

The ALJ further found that the GAF and medical source statement of Mr. Stock was entitled to little weight and was inconsistent with the objective medical evidence of record.  (<u>Id.</u>)  That evidence also failed to support the conclusions of Ms. Burner and Dr. Dunn because neither were as limiting as the evidence indicated.  (<u>Id.</u>)

Also, Plaintiff's substance abuse was in remission.  (<u>Id.</u> at 19.)

With her RFC, the ALJ concluded, Plaintiff was able to return to her past relevant work as a cleaner as she actually performed it.  (<u>Id.</u>)  The ALJ noted that Plaintiff had described her job as a cleaner as a job that did not require continuous handling or fingering.  (<u>Id.</u>)  He further noted that the job of cleaner as described in the *Dictionary of Occupational Titles* (DOT), number 381.687-018, is medium work.  (<u>Id.</u>)

Because Plaintiff could return to her past relevant work, she was not disabled within the meaning of the Act.  (Id.)

### Additional Medical Records before the Appeals Council

Additional records were submitted to, and considered by, the Appeals Council.  They are summarized below.

In April 2011, Ms. Phillips-Kuelker noted that Plaintiff was in an unsafe homeless shelter and had been kicked out of her previous one.  (Id. at 551-52.)  Plaintiff's listed diagnoses were major depressive disorder, single episode; unspecified psychosis; unspecified personality disorder; and cocaine, alcohol, and cannabis dependence, each in remission.  (Id. at 551.)  As of October 2010, her GAF was 50.  (Id.)

Ms. Phillips-Kuelker noted after a therapy session with Plaintiff seven days later that there was no change in Plaintiff's mental status or diagnoses; Plaintiff was to continue on her treatment plan.  (Id. at 553-55.)

On June 22, Dr. Kieffer listed Plaintiff's diagnoses as carpal tunnel syndrome and ganglion of her right wrist.  (Id. at 547.)  He discharged her from care with no need to follow-up.  (Id.)

The next day, Plaintiff saw Dr. Asaro.  (Id. at 548-50.)  She was depressed about the pain in her hands, and was to continue on her current medications.  (Id.)  The same day, Ms.

Phillips-Kuelker reported that there was no change in Plaintiff's mental status.  (Id. at 556-58.)  Her GAF, however, was 55.[22]  (Id.)

Plaintiff was informed on December 8 that she was eligible for vocational rehabilitation services.  (Id. at 563.)

Four days later, Dr. Asaro referred Plaintiff to an orthopedist for her osteoarthrosis, instructed her to keep her appointment at Barnes for her episodic mood disorder, injected her trochanteric bursa, and told her to follow up in six weeks.  (Id. at 568.)  Her medications included Flexeril, Seroquel, Lexapro, Flonase, Lopid, Lexapro and Celebrex.  (Id. at 566-68.)

Dr. Asaro also completed a Work Capability Form for Plaintiff, reporting that she can occasionally and frequently lift and carry ten pounds or less; stand or walk for at least two hours in an eight-hour day; and sit for approximately six hours in an eight-hour day.  (Id. at 561.)  She should never climb or crawl.  (Id. at 562.)  She should only occasionally stoop, kneel, crouch, squat, twist, and bend.  (Id.)  Her abilities to reach and finger are limited.  (Id.)  Her grip strength in each hand was 4/5.  (Id.)  She should avoid concentrated exposure to temperature extremes and should avoid moderate exposure to working near chemicals and fumes, working with machinery, and being around vibrations.  (Id.)  She should avoid all exposure to working at heights.  (Id.)  She can do jobs that involve light cleaning, bussing tables, or food preparation.  (Id.)

---

[22]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34 (emphasis omitted).

In May 2012, Ms. Phillips-Kuelker completed a Mental Medical Source Statement, assessing Plaintiff as being markedly limited in two of the five of the activities of daily living: her abilities to (1) cope with normal stress and (2) behave in an emotionally stable manner. (<u>Id.</u> at 573-76.) She was moderately limited in two: her abilities to (1) function independently and (2) maintain reliability. (<u>Id.</u> at 573.) She had no limitations in her ability to adhere to basic standards of neatness and cleanliness. (<u>Id.</u>) In the area of social functioning, Plaintiff was markedly limited in all but one of the five abilities: (1) relating to family, peers, or caregivers; (2) interacting with strangers or the general public; (3) accepting instructions or responding to criticism; and (4) asking simple questions or requesting assistance. (<u>Id.</u> at 574.) She was moderately limited in the fifth ability: her ability to maintain socially acceptable behavior. (<u>Id.</u>) Plaintiff was moderately limited in all five activities in the area of concentration, persistence, or pace. (<u>Id.</u>) She could "apply commonsense understanding to carry out simple one to two step instructions" for six hours in an eight-hour period. (<u>Id.</u> at 575.) For four hours, she could interact appropriately with coworkers, supervisors, and the general public. (<u>Id.</u>) Her psychologically-based symptoms would cause her to miss work at least three times a month and be late at least two times a month. (<u>Id.</u> at 576.) Her limitations have, or can be expected to, last at least twelve months. (<u>Id.</u>)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable

physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002).  Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920[23]; **Hurd**, 621 F.3d at 738; **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.1520(c).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

---

[23]Unless otherwise indicated, all citations to the Code of Federal Regulations are to the 2011 revision in effect at the time of the ALJ's decision.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of

medication; [5] functional restrictions.'" **Id.** (quoting <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines "'whether a claimant's impairments keep her from doing past relevant work.'" **Wagner v. Astrue**, 499 F.3d 842, 853 (8th Cir. 2007) (quoting <u>Jones v. Chater</u>, 86 F.3d 823, 826 (8th Cir. 1996)). If "the claimant has the [RFC] to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." **Lowe v. Apfel**, 226 F.3d 969, 973 (8th Cir. 2000).

If, however, the ALJ holds at step four of the process that a claimant cannot return to her past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones v. Astrue**, 619 F.3d 963, 968 (8th Cir. 2010); **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred by (1) not performing a function-by-function assessment of Plaintiff's work-related abilities; (2) not describing how the evidence supported his RFC findings, including the one mental limitation of being restricted to simple work; and (3) by not making explicit findings on the demands of Plaintiff's past relevant work.

"The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." **Roberson v. Astrue**, 481 F.3d 1020, 1024 (8th Cir. 2007) (quoting S.S.R. 96-8p, 1996 WL 374184, *3 (S.S.A. July 2, 1996)). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. RFC does not represent the *least* an individual can do despite his or her limitations, but the *most*." S.S.R. 96-8p, 1996 WL 374184, *2 (footnote omitted). "[S.S.R. 96-8p] cautions that a failure to make the function-by-function assessment could 'result in the adjudicator overlooking some of an individual's limitations or restrictions.'" **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting S.S.R. 968p, 1996 WL 374184, *1). An ALJ does not, however, fail in his duty to assess a claimant's RFC on a function-by-function basis merely because the ALJ does not address all areas regardless of whether a limitation is found. See **Id.** Instead, an ALJ who specifically addresses the areas in which he found a limitation but is silent as to those areas in which no limitation is found is believed to have implicitly found no limitation in the latter.

**Id.** at 567-68. <u>See</u> <u>also</u> **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ does not fail in duty to fully develop the record by not providing "an in-depth analysis of each piece of record"); **Craig v. Apfel**, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.").

The ALJ found a limitation in Plaintiff's use of her hands – she could not handle, grip, or finger with her upper extremities on more than a frequent basis. "*Reaching, handling, fingering, and feeling* require progressively finer usage of the upper extremities to perform work-related activities. Reaching . . . and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) are activities required in almost all jobs. Significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do. . . . 'Fingering' involves picking, pinching, or otherwise working primarily with the fingers. It is needed to perform most unskilled sedentary jobs and to perform certain skilled and semiskilled jobs at all levels of exertion. As a general rule, limitations of fine manual dexterity have greater adjudicative significance – in terms of relative numbers of jobs in which the function is required – as the person's exertional RFC decreases. Thus, loss of fine manual dexterity narrows the sedentary and light ranges of work much more than it does the medium, heavy, and very heavy ranges of work." S.S.R. 85-15, 1985 WL 56857, *7 (S.S.A. 1985).

There was conflicting medical evidence about Plaintiff's difficulties with her hands and wrists. For instance, when consulting Dr. Debartolo, a specialist, she had a "mildly positive"

Tinel's sign and a positive Finkelstein's test. (See R. at 11.) Dr. Kieffer reported positive Tinel's and Phalen's signs, but a negative Finkelstein's test. Dr. Moore reported negative Tinel's and Finkelstein's test. Dr. Kieffer's examinations of Plaintiff's hands generally described them as abnormal in appearance and tender on palpation. He also reported she had a limited range of motion in her right wrist.[24] Drs. Moore and Rashid reported that Plaintiff had a full range of motion in her right hand. Dr. Kieffer diagnosed Plaintiff with carpal tunnel syndrome; Dr. Moore opined that the problem was more likely to be arthritis; Dr. Nimigan could determine no organic cause for the pain.

After reviewing in detail the medical evidence, the ALJ found Plaintiff had a severe impairment of carpal tunnel syndrome and the above-described limitation in the use of her hands. This limitation, the ALJ further found, restricted Plaintiff from using her upper extremities on more than a frequent basis. "'Frequent' means occurring from one-third to two-thirds of the time." S.S.R. 83-10, 1983 WL 31251, *6 (S.S.A. 1983). She could with this limitation, however, return to her past relevant work as she actually performed it.

"'An ALJ's decision that a claimant can return to [her] past work must be based on more than conclusory statements. The ALJ must specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the

---

[24]The Commissioner states that Dr. Debartolo's attributed Plaintiff's limited range of motion to a lack of cooperation and not to a "'true organic dysfunction.'" (Def.'s Br. at 4, ECF No. 19.) The accuracy of this statement is questionable. Dr. Debartolo stated that the limited range of motion should be correlated with a lack of cooperation rather than an organic dysfunction. He did not clarify whether this was his conclusion or whether it was a possibility to be affirmed or negated. The Court notes that Dr. Debartolo also found a diminished grip strength in Plaintiff's right hand and a positive Finkelstein's test, neither of which he attributed to a lack of cooperation.

claimant's residual functional capacity.'" **Pfitzner v. Apfel**, 169 F.3d 566, 568 (8th Cir. 1999) (quoting Groeper v. Sullivan, 932 F.2d 1234, 1238–39 (8th Cir.1991)).  "A conclusory determination that the claimant can perform past work, without these findings, does not constitute substantial evidence that the claimant is able to return to [her] past work." **Groeper**, 932 F.2d at 1238.

Plaintiff described the use of her hands to handle, grasp, or grip small objects as being required in her past relevant work as a cleaner seven hours in an eight hour work day.  This is more than frequent.  In his decision, the ALJ paraphrased Plaintiff's description as not requiring "continuous handling or fingering."  (R. at 19.)  Whether the one-hour difference between seven and eight supports his interpretation or not – and the Court doubts that it does[25] – need not be decided because the requirement that she use her hands to handle, grasp, or grip small objects for seven hours is beyond the limitations incorporated by the ALJ in his RFC assessment.  Having based his decision that Plaintiff could return to her past relevant work as she actually performed, the ALJ may not disregard the only evidence before him, i.e., her written description of such, of the exertional demands of that work.

Nor may the ALJ rely on the functional demands of the job of cleaner "as generally required by employers in the national economy."  **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007).  Although the DOT is defined in the regulations "as a resource in determining the duties of a claimant's past relevant work," **id.**, the DOT number cited by the ALJ defines the

---

[25]"Continuous" is defined in the Oxford English Dictionary as "[c]haracterized by continuity, . . . unbroken."  See OED, http://www.oed.com/view/Entry/40280?redirectedFrom=continuous (last visited July 31, 2013).

job as a cleaner as being of a medium exertional level.  See *Dictionary of Occupational Titles*, 381.687-018 (4th ed. rev. 1991) (available at 1991 WL 673258).  That level is inconsistent with the ALJ's RFC assessment.

## Conclusion

The ALJ's conclusion that Plaintiff can return to her past relevant work as a cleaner as she actually performed it is inconsistent with the limitations incorporated by the ALJ in his RFC findings.  The case should be reversed for further proceedings on the existence of jobs that can be performed by a person of Plaintiff's age, education, and RFC.  See **Draper v. Barnhart**, 425 F.3d 1127, 1120 (8th Cir. 2005) (remanding for further proceedings case in which ALJ's finding that claimant could return to past relevant work was inconsistent with ALJ's RFC conclusions).  Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED for further proceedings as discussed above.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  1st  day of August, 2013.